UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────────────

MARY NILAND,

                       Plaintiff,

       v.

BUFFALO LABORERS WELFARE FUND,
BUFFALO LABORERS LOCAL 210, and
THOMAS L. PANEK,

                    Defendants.

**DECISION
and
ORDER**

**04-CV-0187F
(consent)**

─────────────────────────────────────────

APPEARANCES:        SANDERS & SANDERS
                        Attorneys for Plaintiffs
                        HARVEY P. SANDERS, of Counsel
                        401 Maryvale Road
                        Cheektowaga, New York 14225

                        PROSKAUER ROSE LLP
                        Attorneys for Defendants Buffalo Laborers
                         Welfare Fund and Thomas L. Panek
                        LLOYD B. CHIN, of Counsel
                        1585 Broadway
                        New York, New York 10036

                        HARRIS BEACH LLP
                        Attorneys for Defendant Buffalo Laborers
                         Local 210
                        DANIEL J. MOORE, of Counsel
                        99 Garnsey Road
                        Pittsford, New York 14534

## <u>JURISDICTION</u>

On July 19, 2004, the parties to this action consented pursuant to 28 U.S.C. §

636(c) to proceed before the undersigned.  The matter is presently before the court on

motions for summary judgment filed on March 14, 2005, by Defendants Buffalo

Laborers Welfare Fund and Thomas L. Panek (Doc. No. 15), and Buffalo Laborers

Local 210 (Doc. No. 16).

## BACKGROUND

Plaintiff Mary Niland ("Plaintiff" or "Niland") commenced this action on March 22, 2004, alleging employment discrimination in violation of  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the New York State Human Rights Law, New York Executive Law Art. 15, § 290 *et seq*. ("NYHRL").  In particular, Plaintiff maintains that while employed by Defendants Buffalo Laborers Welfare Fund ("the Fund") and Buffalo Laborers Local 210 ("the Local"), she was sexually harassed by her supervisor Defendant Thomas L. Panek ("Panek"), and that upon complaining about the harassment, Defendants retaliated against Plaintiff by denying her overtime work opportunities and other employment benefits, reducing regular work responsibilities, and eventually constructively discharging Plaintiff from her employment.  Answers to the Complaint were filed on June 10, 2004 by Defendant Local (Doc. No. 8), and by Defendants Fund and Panek ("the Fund Defendants") (Doc. No. 9).

Since this action was commenced, Defendants have consistently maintained that they do not qualify as "employers" under Title VII which applies only to employers with at least 15 employees.  According to Defendants, Plaintiff was employed only by the Fund which does not have 15 employees, Plaintiff was never employed by the Local but, rather, performed some services for the Local as a contract employee, and Plaintiff cannot aggregate employees from the Fund, the Local and the related, non-party,

Training Fund to satisfy Title VII's 15-employee threshold.[1]  Niland does not deny that the Fund, by itself, fails to meet Title VII's 15-employee threshold, but maintains that the Local, the Fund and the Training Fund are so interrelated as to constitute a single employer or, alternatively, that Niland was jointly employed by all three entities. Because a determination on this issue in Defendants' favor would result in the dismissal of all the Title VII claims, the parties to this action sought bifurcation permitting discovery and dispositive motions regarding whether Defendants are employers under Title VII.  Accordingly, the October 6, 2004 Scheduling Order (Doc. No. 13) set deadlines for fact discovery and dispositive motions only as to Plaintiff's status as an employee.

Following such discovery, motions for summary judgment were filed on March 14, 2005 by the Local (Doc. No. 15) ("Local's Motion"), and the Fund Defendants (Doc. No. 16) ("Fund Defendants' Motion").  The Local's Motion is supported by the attached Memorandum of Law in Support of Defendant Local 210's Motion for Summary Judgment (Local's Memorandum"), Statement of Material Facts ("Local's Facts Statement"), and Exhibits 1 through 12 ("Local's Exh(s). __").  The Fund Defendants' Motion is supported by the attached Declaration of Lloyd B. Chinn, Esq. ("Chinn Declaration") with attached exhibits 1 through 3 ("Chinn's Exh(s). __"), the Affidavit of Daniel Hurley ("Hurley Affidavit"), and the Affidavit of Thomas L. Panek ("Panek Affidavit"), with attached exhibits A through E ("Panek's Exh(s). __"), the separately filed Statement of Material Facts (Doc. No. 16) ("Fund Defendants' Facts Statements"), and

---

[1] The NYHRL applies to employers with at least four employees.  NY Exec. Law § 292[5] (McKinney's 2005).

a Memorandum of Law in Support of the Buffalo Laborers Welfare Fund and Thomas L.

Panek's Motion for Summary Judgment (Doc. No. 17) ("Fund Defendants'

Memorandum").

      In opposition to summary judgment, Plaintiff filed on July 5, 2005, a

Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment

(Doc. No. 27) ("Plaintiff's Memorandum"), Plaintiff's Local rule 56.1 Statement of

Disputed Material Facts in Opposition to the Motions for Summary Judgment of

Defendants Buffalo Laborers Welfare Fund and Thomas Panek (Doc. No. 28)

("Plaintiff's Dispute as to Fund Defendants' Facts Statement"), and Defendant Buffalo

Laborers Local 210's Motion for Summary Judgment (Doc. No. 29) ("Plaintiff's Dispute

as to the Local's Facts Statement"), the Affidavit of Mary Niland (Doc. No. 30)

("Plaintiff's Affidavit"), the Affidavit of Ann Oliver (Doc. No. 31) ("Oliver Affidavit"), and

six volumes of exhibits containing Plaintiff's exhibits ("Plaintiff's Exh(s). __") 1 through

29 (Doc. No. 32 (Plaintiff's Exhs. 1 - 5)), (Doc. No. 33 (Plaintiff's Exhs. 6 - 10)), (Doc.

No. 34 (Plaintiff's Exhs. 11 - 15)), (Doc. No. 35 (Plaintiff's Exhs. 16 - 20)), (Doc. No. 36

(Plaintiff's Exhs. 21 - 25)), and (Doc. No. 37 (Plaintiff's Exhs. 26 - 29)).

      In further support of summary judgment, the Local filed on July 25, 2005,

Defendant Local 210's Memorandum of Law in Reply to Plaintiff's Memorandum of Law

in Opposition to Defendants' Motions for Summary Judgment (Doc. No. 40) ("Local's

Reply"), the Affidavit of William A. Hoffman (Doc. No. 41) ("Hoffman Affidavit"), with

attached Local's Exhs. 13 and 14, the Affidavits of John McDonnell (Doc. No. 42)

("McDonnell Affidavit"), and the Reply Affidavit of Harlan T. Locking (Doc. No. 43)

("Locking Reply Affidavit").  Also filed on July 25, 2005, in further support of the Fund

4

Defendants' Motion were the Reply Declaration of Thomas L. Panek (Doc. No. 45)

("Panek Reply Declaration"), the Reply Declaration of Daniel Hurley (Doc. No. 46)

("Hurley Reply Declaration"), the Affidavit of James Logan (Doc. No. 47) ("Logan

Affidavit"), and the Memorandum of Law in Reply to Plaintiff's Opposition and in Further

Support of the Buffalo Laborers Welfare Fund and Thomas L. Panek's Motion for

Summary Judgment (Doc. No. 48) ("Fund Defendant's Reply").[2]  Oral argument was

deemed unnecessary.

Based on the following, the Local's Motion is DENIED; the Fund Defendants'

Motion is DENIED.


## FACTS[3]

In November 2000, Plaintiff Mary Niland ("Niland") commenced employment as a

computer analyst at the Defendant Buffalo Laborers Welfare Fund ("the Fund").  As

stated above, Niland does not dispute that each of the three related entities has fewer

than Title VII's 15-employee threshold such that Defendants cannot be held liable under

Title VII unless Niland first establishes either that the Local, the Fund and the Training

Fund were so interrelated as to constitute a single employer, or that Niland was jointly

employed by all three entities.

The Fund is a multiemployer employee welfare benefit plan providing health and

related benefits to employees covered under collective bargaining agreements

---

[2] On July 27, 2005, the Fund Defendants' Reply was refiled as Doc. No. 51 to correct an e-filing error.

[3] Taken from the pleadings and motion papers filed in this action.

("CBAs"), between the Local and various employers.  The Fund is structured as a trust and is governed by a Board of Trustees consisting of eight individuals, four of whom are designated by the Local, and the Fund's organizational structure and guidelines for operations are established by the Declaration of Trust.  The Fund is thus a "trust fund" as used in the Labor Management and Relations Act of 1947 ("LMRA"), 29 U.S.C. § 186(c)(5), and the Fund thus has no actual owners; rather management acts that would typically be undertaken by an owner are performed by the Fund's Board of Trustees, which has delegated the day-to-day administrative duties of the Fund, including management operations of the Fund's office, to Defendant Thomas L. Panek ("Panek").  While employed by the Fund, Niland reported to both Panek and Fund Office Manager Tracy Baugher ("Baugher"), who is not a party to this action.  At all times relevant to this action, the Fund had six or seven employees, including Niland, on its payroll.

Defendant Buffalo Laborers Local 210 ("the Local"), is a labor organization as defined in § 2(5) of the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 152(5), and is affiliated with the Laborers' International Union of North America, AFL-CIO ("LIUNA").  LIUNA's governing management structure, powers and officers is provided by LIUNA's own constitution.  The Local's business operations are subject to a Consent Decree issued by Honorable Richard J. Arcara, dated January 24, 2000, which provides for a court-appointed Liaison Officer, John McDonnell ("McDonnell") to have review and oversight authority as to all significant operations and functions of the Local.  At all times relevant to this action, the Local had no more than seven employees on its payroll, including, *inter alia*, Business Manager William Hoffman ("Hoffman") and Business Agent/Dispatcher Harlan Locking ("Locking").  Both Hoffman and Locking

6

were, at all times relevant to this action, two of the four Fund's trustees designated by the Local.

While employed by the Fund, Niland also performed computer analyst work for the Local as well as the Buffalo Laborers' Training Fund ("the Training Fund"), which is not a party to this action, a multiemployer employee welfare benefit plan providing apprenticeship, vocational and prevocational training and related benefits to employees covered under various collective bargaining agreements ("CBAs").  During the period relevant to this action, the Training Fund had either two or three employees on its payroll.  The Buffalo Laborers' Pension Fund ("the Pension Fund"), and the Buffalo Laborer's Security Fund ("the Security Fund") are other interrelated entities, *i.e.*, trust funds under the LMRA, which have no employees.

Niland alleges that beginning in early 2001, shortly after commencing employment with the Fund, and continuing until April 2002, Panek began sexually harassing Niland through improper attention, unwanted romantic advances, sexually offensive remarks and innuendos, and communications of a sexual nature, all of which were unwelcome to Niland.  Examples of such alleged behavior include repeated personal invitations for Niland to accompany Panek to unrelated work events such as dinner, drinks, bars, Thursday in the Square weekly summer outdoor concert series conducted in downtown Buffalo, local professional hockey games, and other non-work events, despite the fact that Panek was married.  Panek's other alleged improper behavior included repeated unwanted sexual comments regarding Niland's appearance, her body parts, her boyfriend, and Panek's desire to be with Niland. Panek spent much time in Niland's presence at work, despite the lack of any work-

related reason for doing so, made uninvited calls to Niland's personal cellular telephone to discuss personal matters, and sent Niland e-mail messages of sexual and pornographic nature.  Panel also sent Niland flowers at work, gave Niland three raises during her first year of employment amounting to a 25% increase over her previous wages, gave Niland gifts of jewelry during the Christmas 2001 holiday season, which were not given to other office employees.  After Niland purchased a new home in February 2002, Panek stopped by, uninvited, with painting supplies and a drop cloth.

In November or December 2001, Niland complained about Panek's conduct to Locking, Hoffman, and McDonnell, who took no steps to investigate or curtail Panek's conduct.  Subsequent to voicing her complaint, Niland maintains she was subjected to retaliatory actions by Panek, including changes in her job duties, denial of overtime work opportunities, false allegations regarding Niland's work performance, and interference with the performance of Niland's job duties.  These alleged actions caused Niland both emotional and physical suffering, including stress, depression, gastritis, a stomach ulcer, ulcerative colitis, severe rectal bleeding, migraines, recurrence of a previously diagnosed rheumatoid arthritis condition, significant weight loss, difficulty eating and sleeping, and crying spells.  Niland's physicians attributed her health concerns to employment-related stress and sexual harassment, and treatment for her conditions included steroid enemas, oral steroids, chemotherapy, injections and other medications and antidepressants, with frequent monitoring of Niland's health through blood testing.  Niland's poor health necessitated her taking a medical leave from her job in July 2002.  Niland never returned to work at the Fund; rather, Niland considers herself as having been constructively discharged from the Fund as of January 27, 2003

and, in March 2003, obtained other employment.

On February 20, 2003, Niland filed a Charge of Discrimination with the New York State Division of Human Rights, alleging discrimination, retaliation and constructive discharge by the Fund and the Local in connection with her former employment.  On December 23, 2003, the Equal Employment Opportunity Commission ("EEOC") issued its Notice of Right to Sue, advising that more than 180 days had passed since the filing of the charge, the EEOC was terminating its processing of the charge, and that Niland had 90 days to file a Title VII claim in federal court.  This action followed.

## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322.  Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be

sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).

As stated, Defendants move for summary judgment only on the issue whether they are subject to Title VII, which applies only to employers with at least 15 employees. 42 U.S.C. § 2000e(b) (defining "employer" as having "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year. . . ."). According to Defendants, because during the relevant period, the Local had only seven employees, the Fund had only six or seven employees and the Training Fund had only two or three employees, none of the three entities are subject to Title VII. Alternatively, Defendants maintain that Niland was only, at most, a contract employee of the Local.  Niland argues that under the "single employer" doctrine, the business aspects common to the Fund, the Local and the Training Fund permit the three entities to be considered as one, such that the 15-employee threshold is met.  Alternatively, Niland argues that she should be considered as jointly employed by the Fund, the Local and the Training Fund, and that the number of employees in each of the three otherwise separate entities may be aggregated to meet Title VII's 15-employee threshold.

**2.      Single Employer Doctrine**

As stated, Plaintiff alleges the Fund and the Local, based on an aggregation of the employees of the Fund, the Local and the Training Fund, are subject to Title VII pursuant to the single employer doctrine.  "A 'single employer' situation exists where two nominally separate entities are actually part of a single integrated enterprise."

*Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (citing

*Clinton's Ditch Cooperative Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)) (internal

quotation marks omitted).  In a single employer situation, "the nominally distinct entities

can be deemed to constitute a single enterprise."  *Arculeo*, 425 F.3d at 198 (citing *Cook*

*v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995)).  "There is well-

established authority under this theory that, in appropriate circumstances, an employee,

who is technically employed on the books of one entity, which is deemed to be part of a

larger 'single-employer' entity, may impose liability for certain violations of employment

law not only on the nominal employer but also on anther entity comprising part of the

single integrated employer."  *Id*.  Because in the single employer context, nominally, but

technically distinct entities are properly considered a single integrated entity, "*all* the

employees of the constituent entities are employees of the overarching integrated

entity, and all of those employees may be aggregated to determine whether it [the

single employer] employees fifteen [*sic*] employees."  *Arculeo*, 425 F.3d at 199 (italics in

original).

　　　"In other words, the policy underlying the single employer doctrine is the fairness

of imposing liability for labor infractions where two nominally independent entities do not

act under an arm's length relationship."  *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir.

1996) (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th cir. 1983)).  The single

employer doctrine "is most implicated where one entity actually had control over the

labor relations of the other entity, and, thus, bears direct responsibility for the alleged

wrong."  *Id*. (citing *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir. 1993)).  The

single employer doctrine thus is an exception to the doctrine of limited liability, the

rationale for which "is the fairness of imposing responsibility on an entity that shares decisionmaking authority with the employing entity."  *Id*. at 405.

The integrated enterprise test is used to determine whether separate corporate entities "collapse" into a single employer so as to permit the court to calculate the number of employees, for purposes of Title VII prerequisites, by reference to the other entities' employment rolls.  *Murray*, 74 F.3d at 405.  The Second Circuit has instructed that such a collapse occurs only where two or more otherwise separate corporate entities have (1) interrelated operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control.  *Murray*, 74 F.3d at 404 (citing *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile*, 380 U.S. 255, 256 (1965) (adopting single employer criteria established by the National Labor Relations Board).  *See also Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41 (2d Cir. 1995) (accord).  No single factor is determinative, and all four factors are not required, although the second factor, centralized control of labor relations, is the central concern.  *Murray*, 74 F.3d at 404-05 (citing cases).

For example, in *Cook*, 69 F.3d at 1240-41, the Second Circuit held that the defendants were not entitled to summary judgment based on the Title VII 15-employee threshold where there was substantial evidence in the record an of interrelationship of operations between the parent company and the wholly-owned subsidiary for which the plaintiff worked.  In particular, the parent company managed the subsidiary "in a direct, hands-on fashion, establishing the operating practices and management practices" of the subsidiary."  *Id*. at 1241.  Employment applications for the subsidiary were reviewed

12

by the parent, personnel status reports were approved by the parent which cleared all major employment decisions. *Id*. Although the plaintiff worked for the subsidiary, she was hired by the parent's vice president of human resources and fired by an employee of the parent. *Id*. The parent and subsidiary companies also maintained a common management structure. *Id*.

Whether two entities constitute a "single employer" is a question of fact. *Lihli Fashions Corporation v. N.L.R.B.*, 80 F.3d 743, 746 (2d Cir. 1996). Nevertheless, whether a defendant qualifies as an "employer" as defined by Title VII may be resolved on summary judgment where the facts critical the determination are undisputed. *Da Silva v. Kinsho International Corp.*, 229 F.3d 358, 365-66 (2d Cir. 2000) (holding the threshold number of employees for Title VII application is not a jurisdictional issue provided the plaintiff makes a non-frivolous claim that the defendant is a covered employer).

In the instant case, many of the business operations of the Local, the Fund, the Training Fund and the Pension Fund are distinct.[4] In particular, the Local and the Fund maintain separate offices within the same building, located at 2750 Harlem Road in Cheektowaga, New York.[5] Nevertheless, the Fund and the Local are separated within the building by a common, solid wall containing neither windows nor any other access such that the only way to move from the offices of one to the offices of the other is by

---

[4] The Employee Retirement Income Security Act of 1974 ("ERISA"), 29, U.S.C. § 1101 *et seq.*, prohibits the Fund from engaging in numerous financial transactions with the Local, 29 U.S.C. § 1106(a)(1), but such restriction is only a factor under *Murray*, 74 F.3d at 404, to be considered and is not, by itself, determinative as to whether, for Title VII purposes, the single-employer doctrine applies.

[5] Although the Pension Fund is a separate legal entity, it has no employees and occupies the same office space as the Fund at 2750 Harlem Road.

crossing through the foyer.  The Fund and the Local maintain separate banking and payroll accounts.

There is also evidence in the record establishing that much of the daily operations of the Fund were separate from the Local.  Whereas Panek directly managed the Fund, the Local was managed by Hoffman.  Niland Tr.[6] at 61-65.  Niland's employment with the Fund was governed by a CBA between the Fund and the Office & Professional Employees International Union ("OPEIU"), which did not apply to Plaintiff's performance of computer-related services, provided on a consultant, *i.e.*, contract basis, with the Local.  Niland Tr. at 63-64.  Hiring, firing and disciplinary decisions were never made by Panek with regard to the Local, nor by Hoffman with regard to the Fund. Niland Tr. at 64-65. Further, Baugher instructed Niland to deduct time spent working for the Local from time sheets submitted to the Fund.  Niland Tr. at 60.  Niland admits she was compensated by the Local for the consulting services on a Tax Form 1099 independent contractor basis, indicating the Local did not withhold taxes from the wages it paid Niland, in contrast to the Fund which compensated Niland as a Form W-2 employee with applicable payroll taxes withheld.  Niland Tr. at 73, 81-82.

Nevertheless, there is no question that the Fund, the Training Fund and the Local are interrelated operations.  Specifically, for both 2001 and 2002, the Fund listed on its IRS Tax Form 990, which mandates reporting of organizations related "through common membership, governing bodies, trustees, officers, etc.," the Pension Fund, the Training Fund and the Local.  Plaintiff's Exh. 2 (underlining added).

---

[6] References to "Niland Tr." are to the transcript of Niland's deposition, filed as Chinn Declaration Exh. 1.

The governing boards of both the Fund and the Training Fund are comprised of the same eight members and the boards of both entities often meet at the same time. The Fund provides administrative services to the Training Fund pursuant to an agreement between the two entities.  Specifically, the Fund monitors revenue and administers cash disbursement functions of the Training Fund.  The Fund also administers the payroll of the Training Fund, although when payroll checks to Training Fund employees are issued, the payroll funds are paid from the Training Fund's bank account.  Physically, the Training Fund is located at 1370 Seneca Street, in Buffalo, which location is separate from 2750 Harlem Road.

Four of the Fund's eight board members are designated by the Local, while the remaining four trustees are representatives of contributing employers designated by the Construction Industry Employers Association.  In fact, Local officials Hoffman, the Local's business manager, and Locking, the Local's business agent, are two of the Fund's trustees, although the other two board members designated by the Local are members of the Local, but are neither officials nor employees of the Local.

During 2002, employees of the Fund and the Local attended a harassment training program, and a speech by a Cornell professor together.  The Fund pays for a health fair in conjunction with the Local's annual picnic, and the Fund and the Local have shared expenses for several social gatherings and Christmas parties.  For a six-month period in 2002, the Fund and the Local shared the same internet services providers before the arrangement was terminated.  The Fund and the Local share expenses for rugs provided by NLS Linen in the shared foyer between their separate business suites.

Also significantly present in the instant action is the undisputed fact that but for

the Local, neither the Fund, the Pension Fund nor the Training Fund would exist given

that the Funds were created only to serve the Local membership.  It is also undisputed

that the existence and operations of the Fund, the Training Fund, and the Pension

Fund depend for their existence and functioning on the fact that they are "established"

by the Local for the "sole and exclusive benefit" of the Local's membership.  29 U.S.C.

§ 186(c)(5) (permitting payments by an employer to an employee benefit trust

established in accordance with 29 U.S.C. § 186(c)).  *See also* Constitutions of the

Laborers' International Union of North America, Defendants' Exh. 1, at 45 (LIUNA

directing the establishment of separately maintained employee benefit funds), and 113

(authorizing District Councils of the Locals to establish "insurance, health and welfare,

pension, severance and other employee benefit plans").  Such mutuality of existence

has been viewed as sufficient to hold a related entity liable for the discriminatory acts of

the defendant employer.  *See Morgan v. Safeway Stores, Inc.*, 884 F.2d 1211, 1217 (9th

Cir. 1989) (Nelson, J., dissenting) ("an employer cannot escape Title VII by delegating

its responsibility for the evenhanded provision of fringe benefits to a third party whom

the employer knows will discriminate" where there is substantial overlap in operations

between the employer and the benefits provider).[7]  *See also Equal Employment*

*Opportunity Commission v. Colby College*, 589 F.2d 1139, 1141 (1st Cir. 1978) (holding

that although annuity association was separate from college, because college

---

[7] In *Morgan*, the court held that although the defendant grocery store chain sponsored the defendant credit union, in the absence of any evidence that the grocery store chain had any control over the credit union's selection of board members and as no board member from either entity overlapped, the was no genuine issue of fact as to whether the defendants collapsed for purposes of Title VII's 15-employee threshold.  *Morgan*, 884 F.2d at 1214.

employees looked solely to such association for payment of pension benefits, the college was not relieved of responsibility for alleged violations of equal employment opportunity statutes given that the college required all eligible employees to participate in the annuity plan).  Similarly, in the instant case, because the Fund and the Training Fund exist only to service the Local's membership, a reasonable trier of fact could determine that the Local, the Fund and the Training Fund are so integrated as to collapse all three entities into a single employer for Title VII purposes.  *Murray*, 74 F.3d at 405.

Finding that but for the existence of the Local, the Funds would not exist, *Morgan*, 884 F.2d at 1217, is further reinforced by the fact, of which the court takes judicial notice, *see* Fed. R. Evid. 201(b)(2) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."), that despite Defendants' assertions that the Fund and the Local maintained separate legal counsel, the Fund Defendants and the Local were all represented by the same law firm, Gorlick, Kravits & Listhaus, P.C., in at least six other civil actions such Defendants filed in this court since the instant action was commenced.  *See Buffalo Laborers Welfare Fund v. Progressive Weatherproofing, Inc.*, 04-Cv-212A(HKS) (filed March 31, 2004); *Buffalo Laborers Welfare Fund v. L.M.R. Construction Corp.*, 05-CV-A(HBS) (filed February 9, 2005); *Buffalo Laborers Welfare Fund v. Elmwood Plumbing, Inc.*, 05-CV-347E (filed May 17, 2005); *Buffalo Laborers Welfare Fund v. E.J. Militello Concrete, Inc.*, 05-CV-548S(HBS) (filed August 4, 2005); *Buffalo Laborers Welfare Fund v. Ascon Contracting, Inc.*, 06-CV-567A (filed August 23, 2006); and *Buffalo*

17

*Laborers Welfare Fund v. Pryor*, 06-CV-608E (filed September 8, 2006).  Defendants in all six actions sought to recover from the respective defendants, all  monetary contributions due to either the Local or to the Fund, strongly suggesting a unity of purpose and a significant degree of "interrelated operations," "common management," and "common ownership and control," *Murray*, 74 F.3d at 404, supporting that the Local and the Fund are to be treated as a single employer for Title VII purposes. Significantly, in ¶ 4 of each of the Complaints filed in each of these actions, the stated business purpose of the Fund, along with the Pension Fund, the Training Fund, and Buffalo Laborers Annuity Fund ("the Annuity Fund") (together, "the Funds"), "is to provide various fringe benefits to eligible employees on whose behalf employers contribute to the Funds pursuant to collective bargaining agreements between employers in the building and construction industry and the Union [Local]."   The Complaints in the latter five actions further state that "[a]s collectors and trustees of employer contributions made pursuant to collective bargaining agreements between the employers and the Union [Local], the Funds are third-party beneficiaries to such collective bargaining agreements," *id*., further underscoring the highly integrated relationship between the Local, the Fund and the Training Fund.

Insofar as Niland complained of Panek's behavior to Local employees Hoffman and Locking, as well as McDonnell, and nothing in the record suggests that such procedure was improper or that upon making such complaints, Hoffman, Locking or McDonnell directed, instructed or suggested Niland should complain to someone else within the Fund.  In fact, upon receiving Niland's complaint, Hoffman and Locking, both officers having broad responsibility for the Local's day-to-day management, referred

Niland's complaint to the Local's attorney.  Hoffman Reply Affidavit ¶¶ 43-44; Locking Reply Affidavit ¶ 6.  The reality is, therefore, that Hoffman and Locking, as Fund trustees, had substantial authority over Panek, including the Fund's employment matters in general, and Niland's harassment complaint in particular.  As Hoffman averred "[n]o doubt, she [Niland] chose to come to Mr. Locking and me with this issue for the simple reason that as Trustees who happened to be working next door at the [Local], we were the logical choice for her complaint <u>since there was no one else at the Fund who exercised authority over the Administrator, Mr. Panek</u>, and no other Trustee was as accessible on that day."  Hoffman Reply Affidavit ¶ 43 (underlining added).  That Hoffman and Locking, major Local officials, along with two other unnamed trustees, served as Fund trustees designated by the Local reasonably establishes that the Local was at least 50% responsible for overseeing who served as the Fund's Administrator.  On this record, the trier of fact could find that because the Fund, as well as the Training Fund, exist solely to provide benefits to the Local's members, function in close coordination with the Local, and are substantially controlled by the Local though their respective boards, the three entities should be collapsed into one, thereby meeting the 15-employee threshold for purposes of Title VII.

Accordingly, the instant case presents material issues of fact as to whether the single employer doctrine applies to the Local, the Fund and the Training Fund, sufficient to avoid summary judgment.

**3.     Joint Employer Doctrine**

Alternatively, Niland relies on the joint employer doctrine as rendering the Fund

and the Local subject to Title VII.  In contrast to the single employer doctrine, a "joint employer" relationship is not predicated on any single integrated enterprise; rather, "[a] conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly." *Arculeo*, 425 F.3d at 198 (citing *Clinton's Ditch*, 778 F.2d at 137) (internal quotation marks omitted).  In a joint employer situation, "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer."  *Id*.

In further contrast to a single employer context in which all the employees of the constituent entities are considered employees of the overarching integrated entity, permitting all such employees to be aggregated in determining whether Title VII's 15-employee threshold is met, in the joint employer context, "it does not follow that all the employees of both employers are part of an integrated entity encompassing both." *Arculeo*, 425 F.3d at 199.  Rather, although a joint undertaking by two entities as to the employment of a particular individual may justify counting such individual as an employee of both entities, "such joint undertaking does not furnish the logistical justification for adding together *all* employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other."  *Id*.  (italics in original).

In the instant case, even assuming, *arguendo*, that the evidence Niland submits on her joint employer argument supports finding that Niland was jointly employed by

both the Local, the Fund and the Training Fund, such evidence fails to establish a material issue of fact exists as to whether all employees of each of the three constituent entities, *i.e.*, the Fund, the Local and the Training Fund, were jointly employed by the remaining two entities so as to warrant aggregating all such employees to meet Title VII's 15-employee threshold.  Accordingly, the court will not further consider this argument.

**4.      State Law Claims**

As the court is denying summary judgment as to the Title VII claims based on the single employer doctrine, Defendants' request that the court decline to exercise supplemental jurisdiction over Niland's pendent state NYHRL claims is also DENIED.

## CONCLUSION

Based on the foregoing, the motions for summary judgment (Docs. No. 15 and 16) are DENIED.  The parties are directed to appear before the undersigned on November 8, 2007 at 10:00 A.M., to schedule further proceedings.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
                LESLIE G. FOSCHIO
        UNITED STATES MAGISTRATE JUDGE

DATED:       October 17, 2007
                 Buffalo, New York